Greg Rickard for Appellant and Petitioner Mark Bridges. I've been working on this case for six years and I'd like to reserve three minutes for rebuttal if I can do that. I want to get right to the point. A recent Ninth Circuit decision described the EPPA standard of review as the elephant in the courtroom. And I want to start there. Quoting from the Respondent's Brief, which quotes Richter, Section 2254D reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems. And that is exactly what happened in this case. What happened is the defense attorney, Mr. McKinney, elicited perjury on a crucial issue, the murder weapon. And the jury was very, very aware of it. I thought the murder weapon was a nine millimeter. Perhaps I should be more specific. On the the weapon that the defense claimed was the weapon that Mark had fired. And that that perjury coupled with the refusal of the defense to turn that over for testing. Basically. But as it turned out, it was even more clear in the post-trial forensic evidence that it was a nine millimeter that was the murder weapon and that the defense was self-defense. So the defendant wasn't contending that he didn't shoot. He agreed he did shoot. There was no evidence that anybody shot a .38. So the only evidence that this was the murder weapon was his say so, right? That's correct. And also, you know, after the the after this came out during the trial, it was clear that the defense attorney certainly agreed that that he had the weapon and that the weapon was available for testing. But we've got a finding by the state courts that it wouldn't have made any difference because of the fact that there would be no way to establish except through Mr. Bridges testimony that this was the gun that he carried on the day in question. But all of the percipient witnesses describe a semi-automatic pistol and they watched as the murder weapon ejected shells. So the state superior court judge concluded it wouldn't have made any difference what the defense lawyer did with the 38 that the jury simply wouldn't have believed that that was the gun that he was carrying on the day in question. The issue here that we are raising is not at all dependent upon proving that Mark fired that 38. The issue that we are raising is the effect on the jury of the defense attorney calling the father of Mark and having him first say that he didn't that he didn't have the weapon and then saying that he did have the weapon. Well, first of all, what is the evidence that he actually told him to lie as opposed to he lied? Pardon me? What is the evidence that he told him to lie as opposed to he lied? There is no evidence that he told them to lie. But the evidence is that his own investigator provided a declaration stating that he knew in advance that Mark Sr. had the gun. That's the evidence. But he knew in advance that Mark Sr. had a gun. No, he knew that he had received the 38 which Mark, at the very beginning, when he was first interrogated, said he fired the 38 and he stuck with that story. I thought he was all over the map. Both his father and your client changed his story many times. Not in terms of the 38. Well, in terms of the earlier interviews, yes, they did. No, he consistently said that he, he consistently, when he got to the point of admitting he fired a gun, he consistently stated that he fired the gun. See, then you're skipping over the problem. Pardon me? First of all, he said he didn't fire a gun. Right. But, I mean, the point is, since we're under AEDPA, your client has the burden to show that he was prejudiced. In order to do that, he's got to show that there's no reasonable probability that the jury would have changed its mind. And given the fact that he lied, that the father lied, how can a juror be blamed for saying there was no reasonable probability that the jury would simply not have believed a different story on this? Well, the... It's your burden, right? I would say that my burden is to show, is to undermine confidence in the verdict. Well, it's more than that. But the father in the pretrial interview said he didn't have the gun, he didn't get the gun. So he said the same thing in his pretrial interview, as he first said, on, when he was questioned during the trial. So what makes you think that it had anything to do with what the lawyer did? Because the lawyer knew that he had the gun. Well, he might have known that, but he also knew what he'd said to the pretrial person, and he had this problem. If he said he did have the gun, he was going to be impeached. If he said he didn't have the gun, then at least... So if the... And besides which, there's no evidence that the attorney told him what to say, as opposed to answer the question. That is true. But the fact remains that his investigator told him in advance he had the gun. Now, how more incompetent can an attorney be to call the father of the defendant on a critical issue... Well, he might have thought he was going to tell the truth and say he had the gun. I'm sorry, and have no idea what he's going to say. We don't know that either. Maybe he thought he was going to say he had the gun, and then he said he didn't have the gun. This guy was just all over the place, because then he said he had the gun, but he took it apart. Then he said, no, I gave it to a friend. Then he said, no, I have it. So he said four different things, not just two different things. That's true. And the problem is under Strickland, you've got the both prongs. You're trying to attack it on both. But even if we assume that this attorney satisfied the prong, the first prong, I still am struggling with how you show prejudice for the reason I previously indicated. You have the burden to show that there's a reasonable probability that with all of this mess and all of the lies that the jury was going to change its mind. That's a very difficult burden to meet, and you have to do it in order to be successful under Strickland. Right. And I think that you cannot look at that issue in isolation. I think that you also have to look at the assertion that there was a second shooting, that the jurors never. . . That's a separate point. You're going to go to that now? Well, yeah, I think it's not unusual to make a cumulative. . . I'm not objecting to it. I'm just saying you're changing the subject now. You're attacking various things that the attorney allegedly did. But are we done now with the gun issue? I'm not done, but I do want to say that your major problem is prejudice. That's your major problem, not my major problem. My problem. I agree. My major problem is prejudice. The fact that one of the very first witnesses on the scene, a credible person, a dean at the high school, saw casings being collected a great distance from where it was undisputed where Mark had fired his gun. And that is something that the jury never heard about at all. And it was something that certainly the motion for new trial attorney Davis should have picked up on. So neither the prosecution nor the defense asked Mr. Cano where he picked up the shell casing? They did pick up the shell. . . yes. I know they did. That certainly came out. It did come out. As to where he picked up the shell casing. Right. He picked up the casings up at Jefferson. The place where the dean saw the casings picked up was more than 100 yards away. The dean. . . did he testify at the trial? Yes, he did. Right. And so he didn't say that then. He said it later, right? No. Mr. McKinney never investigated that issue, even though he had been given the videotape of Sergeant Engadall talking about a completely different shooting that involved a vehicle. . . Engadall never signed such a declaration. No. Nobody else ever signed a declaration about there being a car, there being somebody commanding the car, somebody shooting from a car, or anything like that. No, but his tape recorded as making those statements, and there are also other circumstantial evidence of a shooting there. I thought that the trial judge, the superior court judge, called Sergeant Engadall in after the trial and determined that Engadall basically was not a competent witness because he was acting on the basis of like eighth-hand hearsay at the time he was interviewed by the television reporter. He was never. . . he never was sworn as a witness. No, that's not my question. He did appear. . . yes, he did appear. I don't believe that it's fair to say that he was. . . that the judge determined that he was not a competent witness. He stood up in court, and he said, somebody came and told me that. . . what happened. That's what he says. At first he says, I didn't know anything about it. Then he says, well, this is what they told me. Now, there's a number of ways that that could be admissible. It could come in as an excited utterance, and it could come in as an inconsistent statement. But counsel, to record that in a trial, particularly one like this, a trial lawyer has to weigh what he or she thinks is best for the client, right? You may think strategically, I don't want this witness because this might flow from it, and I want this one because of this. It's a strategy. Sometimes it works, sometimes it doesn't. And as an illustration of that, he didn't ask anything of Detective Yoshida about where he picked up the shells, how he measured it, all that sort of thing. That's critical evidence on the point that you're talking about. And is a professional officer who did this, unlike the hearsay that you just spoke of. And yet there was no cross-examination at all by the defense lawyer of this, nor by anybody else. So there are strategic decisions made, but again, you get down to the issue, we get down to the issue under AEDPA, that you've got to show prejudice. Number one, that there was incompetence. And in this case, you've got a tough deal with the first prong. But on prejudice, how do you show that there is a reasonable probability that if you'd added this other witness with all of the hearsay, that it would have made a difference? How can you bear that burden? Well, first of all, it's not another witness with all of the hearsay. We're talking about a dean. I understand you. There are a lot of deans that may not have seen things personally that are good witnesses. As my colleague just pointed out, the dean in this case relied upon hearsay to make the statement that he did. No, the dean didn't. Oh, the dean didn't? Okay, I thought the dean did, in any event. Even if he saw it directly, he's a person. His deanship has little to do with whether he's a good witness to what happened in this case. Well, the fact that he confronted the young man who was picking up casings and told him, you should not be tampering with evidence, you shouldn't move those casings, I think makes him a pretty good witness. But the question is, what was the corner on which Mark Bridges, he said he shot from? It was all the way up at Jefferson. It was measured as being 1,400 feet. It was clear that it was at the corner rather than moving. The other people were where? They were further south? The other people were further south. Right. That's correct. The notion, and it was at exposition where the dean said he saw the casings? Yes, yes, and that was where Dotson eventually fell. Right. And that was more than 100 yards away. And we don't know that Bridges could have been moving? There's no testimony at all. There was no testimony at all. There was a statement that he charged and there was briefing back and forth on that. He had a physical altercation. Pardon me? He must have been in the same place at the same time at some point. Right, right. It was basically he at one point moved toward them, but he eventually went back the other way from which he came. He went across Jefferson. According to whom? I want to respond to that. According to whom did he eventually go back? Pardon me? According to Cano, the fellow, the Latino guy who picked up the casings who was probably the key in Dotson were the primary witnesses. Just in terms of the picking a defense, the self-defense that he put all of his eggs in his basket was just ridiculous. The Celtic instruction says the right of self-defense ends when there's no longer any apparent danger of further violence. Both of these witnesses, the two primary witnesses, Dotson and Cano, said that he pulled out the gun, he stopped the altercation, he left. He went out of view. He returned and started firing. But Bridges didn't say that. This is not a self-defense case. I'm sorry? Bridges didn't say that. Bridges didn't say that? Yes. Yeah, that's correct. That's correct. No, Bridges' defense was that that wasn't true. What was true was that he actually saw him pull a gun, not just had a gun, and then he shot because he thought he was in danger. That's what he said. Right, right. And it would seem that, you know, given that that was the only person who, you know, who testified, that was a very weak defense. And the other thing is there's nothing at all inconsistent about saying there was a second shooting and it was also self-defense. You don't have to pick one or the other. But there is absolutely no direct evidence of a second person. And the person who died said that it was – who didn't die said it was Bridges who shot him. And the witness who they didn't call and who you say they should have, Machuco or whatever her name was, she said it was Marcus who shot him. So what evidence is there that there was anybody else shooting? The fact that casings were picked up a football field away from where Mark's – the casings that were associated with Mark. That's what this whole case is about. And the issue comes down to when does the state court have to do some fact-finding? Is it enough that you have – I don't think you can find a more credible declaration, a habeas declaration. A person who, when I got it from him, was an assistant principal in another high school. And, you know, the idea that, you know, that he would commit perjury. The fact that he – and the same thing with the private investigator. That's not really the issue in an EPA case, is it? The issue in the EPA case is to what extent does the court – does the state court have to do some fact-finding? That's the issue. And that's really what is squarely presented in this case. Did these declarations from the private investigator that worked with this attorney and did the recipient witness who was first person on the scene, did that – and I've exceeded my time, so I would like to sit down. Thank you very much. Good morning, and may it please the Court. Deputy Attorney General Shira Siegel on behalf of Appellee, the warden. The district court correctly denied habeas review in this case because under the doubly deferential lens of the EPA, the petitioner failed to show that he received ineffective assistance of counsel. I'd like to just clarify one of the questions that was asked about the casings that Osbon claims he saw being picked up at the intersection of Exposition and Farmdale. What his 2006 declaration says is that he saw a Hispanic male picking up casings 10 to 12 feet from where Dotson fell, which was north of Exposition. So he doesn't say that he saw casings at that intersection. Was that declaration – you say it was in 2006. Was that submitted to the state court? It was on habeas review. The California Court of Appeals, yes. And there was a 2003 declaration that was submitted to the trial court in the motion for a new trial, and Osbon also testified. So the football field away is not what's in the evidence you're saying? But your opposing counsel is suggesting that the casings that you'll hear and have to refer to as the alleged casings were found at Exposition, which he says were 100 yards away from where his client was. Are you saying that the record suggests that they were, in fact, 12 feet north instead of the other way? Well, Osbon doesn't specify whether he saw this person picking up casings north or south of where Dotson fell. Okay, so the evidence is at best not clear. Exactly. But the evidence in the trial record that is clear is that Kano, one of the witnesses, found the casings at the intersection of Farmdale and Jefferson, and that Yoshida, the detective, also found a casing at that intersection. That's what I mentioned earlier. There was no dispute by either party as to what the detective, Yoshida, did and where he found the casings, right? Yes, that's correct. Where does Yoshida say he picked up the single casing that he recovered? Where in the record? No, no, no, just tell me where he told the jury he found it. Oh, at the intersection of Farmdale and Jefferson, which is, again, north of where both of the victims were. And even according to Petitioner's own version of events, he was the only person that was shooting in a southerly direction. So this stands to reason that the victims were hit from the 9mm that he was shooting. The problem with the second shooter theory is there is no testimony by anybody that there was a second shooter, except for Bridges, who claims he was trading shots with Frank. That's correct. But there was some third-party second shooter. Not a second simultaneous shooting that occurred, although Petitioner said that this Frank was shooting in a northerly direction at him. So that would be a second shooter theory. But that wouldn't explain why April Jones got hit 1,440 yards to the south. Exactly. That, frankly, is the most disturbing fact to me, which is how he hit her at 1,440 feet. According to the defense ballistics expert, if the gun was elevated just a mere 3 to 5 degrees, it was possible for a 9mm to go the distance of 1,500 feet. It's not real clear whether she was saying that it could go. Well, first of all, that's what she stipulated to in the post-trial. And then when she actually submitted her declaration as to what her test showed, that wasn't what she said. True. She was assuming that it was held level. And then there was a stipulation between the parties at the motion for a new trial that she, in fact, if the gun was elevated a mere 3 to 5 degrees, it could travel 1,500 feet. But there's no dispute that the range of a 9mm, assuming that it had what the maximum grain load, could travel 1,500 feet. Correct. And, moreover, the bullets pulled from both of the victims were fired from the same gun. And Dodson unambiguously identified Petitioner as the person who shot him. And given that the bullets were fired from the same gun, stands to reason that Petitioner's bullet also hit Dodson. Or, excuse me, Jones. If Dodson was right. Yes, exactly. With respect to the issue about eliciting the testimony about the revolver, the trial court did make a credibility finding that McKinney was surprised when Bridges lied on the stand about having the gun. And there's no reason to disturb the trial court's credibility finding, especially in light of the fact that the trial court was there and was a precipient witness and could see the witnesses' reactions. Well, the defense counsel's reaction. Excuse me, the defense counsel's reaction, yes. The father's surprising testimony. Exactly, exactly. One thing I didn't understand very well was that when the father eventually, I mean, the lawyer eventually understood after that testimony that the father did have the gun. I mean, the gun that they claimed was given to him. And then he thought about it for a while and he said, but I don't want to bring in this gun. They said, you can do the ballistic testing. I said, I don't want to. And he said, because if it turns out that it was fired from this gun, which we now know couldn't have been the case because it was a 9mm, but if he says that it was the gun that was used to kill him, obviously that's bad. And he says, and if it's not that gun, then the defendant had two guns and that's not good either. What does that mean? You know, it's unclear from the record. I'm not sure if that meant that if they were to produce a gun coming, allegedly being turned over by petitioner, that the jury would say, oh, he had both a revolver and a 9mm. Not necessarily in his possession at the time of the crime, but just generally he had multiple guns in his possession. Again, the record's not really clear as to that point. With respect to the first. I find it hard to see why. I mean, I think it's obviate about what happened afterwards, but at that point it was possible that he was shot with a .38 because it wasn't definitive that he wasn't. And so if it were proven that he wasn't shot with a .38, then it might be helpful in demonstrating that if it was that he, that that .38 didn't shoot him, then it might be helpful. And I don't understand it to a gun point. In other words, as a tactical decision or a strategic decision, it seems really pretty illogical. Well, I think that this court can focus on the tactical decision not to bring in this alleged gun because the prosecution's ballistics expert said that she couldn't determine the caliber of the bullets pulled from the victims and trial counsel, therefore, was concerned that it might be a .38. Right, well, I understand that part. Right, exactly. I don't understand the alternative. That's what I didn't understand. Yeah, unfortunately the record is unclear, and I'm sorry I couldn't be more helpful to clarify that. With respect to the bullet pulled from the car, the defense ballistics expert was unable to tell what the caliber of the bullet was, so there's no indication that that would have been helpful to trial counsel. So it's impossible for Petitioner to have proved that he was prejudiced. And basically, as to each of these instances of alleged ineffective assistance to counsel, Petitioner can't prove that he was prejudiced. The overwhelming evidence is that there was one gun. There were five witnesses who said the sounds either sounded like one gun, or they saw only one gun at the scene. Well, were there declarations that, I thought I did see some in the record, that affirmatively said that the lawyer told the father to lie? I thought there was Richardson, the investigator, and maybe the father and the aunt or something that said something about Richardson told him to tell the truth, but the lawyer told him to lie. And what was that all about? There is a declaration from Richardson sort of detailing what he was told by Bridges. Of course, that's hearsay, and the state courts weren't required to accept that as true in evaluating the prima facie case of the petition. But Richardson does say that, according to Bridges, Bridges had brought the matter up to McKinney, and McKinney had told him that he didn't want to deal with it. I thought he said something about expletive Richardson for telling him to tell the truth when I told him to lie. There was a declaration. So Richardson wasn't at court the day that Bridges testified. There was a declaration from a family member who said that she went out into the hall immediately after this whole thing happened and that she saw McKinney yelling at Bridges saying, why did you talk about the 38? I thought you were going to do that. Bridges or Richardson? Bridges, the petitioner's father. And didn't the trial judge catch the father coaching the son during his testimony at trial? Yes, that's correct. Of course, Bridges took the Fifth Amendment. Bridges' father. Yes, the father. And as he was sitting in the audience, the trial court saw the father shaking his head yes or no and the petitioner answering whatever he was shaking his head. And that, again, just goes to show that there would have been no prejudice in this case. It's likely that based on that and the varying versions of who had a gun, what type of gun, where the gun was, that the prosecution would have called Wathers, the detective, who confirmed that petitioner's father said he never received a gun from a petitioner. And based on that statement, it also supports that McKinney had no idea that Bridges had a gun based on his statement to the police initially, that his petitioner had never handed him a gun. Bottom line, he was told that his son had told the police that the son gave the weapon to the father. Detective Walther goes to follow up on that, and the father says, that's not, I didn't get a gun from my son. That's correct. In fact, he said Bridges, petitioner's father, was allowed to go outside and speak to his son. And he came back and said, no, I never got a gun. I, you know, he was scared and felt pressure to say that. I was going to say, bottom line from this perspective, because of AEDPA, there's just no way to prove prejudice where you have a tissue of lies all over the place. They have to show that there's a reasonable probability that the jury would have voted differently. And they can't show that, can they, in this case? That's exactly right. And the strength of the evidence, the five witnesses who say it sounded like one gun, the three witnesses who said that petitioner was shooting a 90-millimeter semi-automatic, the witness who saw the casings flying out of the gun that petitioner was shooting, there are at least three witnesses who identified the shooter as wearing a blue basketball jersey, which is exactly what petitioner said he was wearing that day. And that includes Dean Osborne. And there's multiple witnesses who say that petitioner was the only person shooting in a southbound direction, including petitioner himself. And both of the victims were south of where petitioner was standing. Unless there are any further questions, I would submit them. Thank you. I'll give you a minimum rebuttal. Thank you. Just in terms of the distance from the casings, that is in Detective or Private Investigator Richardson's declaration. He measured the distance from the driveway north of the expo, which was undisputed. That was where Dotson was laying. Osborne said he saw the casings within 10 to 12 feet of him. The distance was 347 feet. He took one of those little things, and that was to the south curb line of Jefferson, which was very close to exactly where Yoshida picked up a casing. So there really, you know, I mean, in terms of the distances, there shouldn't be any issue about that. In terms of firing south, if there were guns fired at the expo, they could have been fired north, they could have been fired south. That's not a thing. The second shooter theory would have to be, would have to show that the rounds were fired in a southerly direction toward Rodeo, would they not? They could have been fired south. They could have been fired north and hit Dotson in the back, who was trying to hide behind a car so that he wouldn't get shot by a... But there was testimony from, was it Machuca, who saw Dotson hiding down behind the car and saw him get hit? No, I don't believe there was. And I don't think it was clear that, certainly Machuca thought that Mark had shot him, but it was not clear at all where she thought those guns were coming from, whether that information had come from him. He made the same remark to the other dean who was on the stand, who testified and was also at the scene very quickly. Who's the him? I'm sorry? You said the same information had come from him. Who's him? The same information had come from Robert Dotson, who was her boyfriend. I'm sorry about that. You're out of time. Thank you very much, both of you. Okay, thank you. The case of Bridges v. McEwen is submitted.
judges: Berzon, Tallman, Smith